# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Application of VRAJ, Inc.    :
T/A Jack's Market    :
    :
           v.    :   No. 2592 C.D. 2015
    :   Argued: September 13, 2016
Pennsylvania Liquor Control Board    :
    :
Appeal of: VRAJ, Inc.    :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**        **FILED: November 30, 2016**

VRAJ, Inc. (Applicant) appeals from the Order of the Court of Common Pleas of Northampton County (common pleas) that upheld the Decision of the Pennsylvania Liquor Control Board (Board) denying Applicant's application for a double transfer (Application) of Distributor License No. D-1370 (License). On appeal, Applicant argues that common pleas abused its discretion in finding that the City of Easton (City) and neighboring business owners had standing to intervene and erred in finding that the double transfer of the License would be a detriment to the health, welfare, peace, and morals of the residents within a radius of 500 feet of the proposed location. Although we find no abuse of discretion in common pleas' permitting the intervention of the City and the neighboring

business owners, we reverse because common pleas' finding that the double transfer would be detrimental is not supported by substantial evidence.

## I. Background

### a. History

Jagdish and Varsha Desai own Applicant, which currently operates a convenience/grocery store in a building that also houses an apartment with an outside entrance above the store. The store "currently sells most items that you would normally find in a large supermarket, except for fresh meats and deli items." (Board Decision, Findings of Fact (FOF) ¶ 8.) Applicant is a financially responsible entity and purchased the License, "as is," from Oasis Beer & Beverages, Inc. (Transferor) at an auction. (Id. ¶ 13; common pleas opinion (Op.) at 2.) Applicant applied for a double transfer (location and ownership) on July 16, 2012, seeking to transfer the License from Transferor's location at 1864 Liethsville Road, Hellertown, PA to Applicant's premises at 222 Northampton Street, Easton, PA. Both locations are within Northampton County. If the double transfer is approved, Applicant would close its convenience/grocery store, remodel the premises, and reopen to sell only those items "permitted to be sold by a licensed distributorship." (Op. at 2.) Applicant sought approval of the Application by the Board prior to beginning renovations on the store. (Id.) A Board licensing analyst reviewed the Application to determine its merits.

As set forth in the letter advising Applicant of a hearing on its Application (Notice), the Bureau of Licensing (Bureau) objected to the Application pursuant to

Section 431 of the Liquor Code (Code),[1] 47 P.S. § 4-431, on the grounds that: (1) Applicant's proposed location in the City would be within 200 feet of other licensed establishments; (2) that location was "within 300 feet of the Cornerstone Church and Lenape Nation Cultural Center"; and (3) Applicant had not "obtain[ed] the required tax clearance from the Department of Revenue." (Op. at 2-3.) The Notice also indicated that evidence should be taken to determine: whether the City,[2] Anthony Marraccini (on behalf of ConneXions Gallery), and Adam Fairchild, owner of the Easton Outdoor Company, would be directly aggrieved to qualify as intervenors;[3] and whether the proposed location would "adversely affect the health, welfare, peace[,] and morals of the neighborhood within a radius of 500 feet of the proposed licensed premises." (Id.)

b. *Proceedings before the Board*

A Board Hearing Examiner held a hearing on these issues in accordance with Section 464 of the Code, 47 P.S. § 4-464 (setting forth the provisions for hearings on, *inter alia*, an application for a malt or brewed beverage license). At the hearing Mr. Desai, the City's mayor Salvatore Panto, Jr. (Mayor Panto), Mr. Marraccini, and Mr. Fairchild, among others, testified. Documentary evidence, including the minutes from a June 13, 2012, City Council meeting, also was

---

[1] Act of April 12, 1951, P.L. 90, as amended, 47 P.S. § 4-431. Section 431 sets forth the provisions related to the Board's approval and denial of "[m]alt and brewed beverages manufacturers', distributors'[,] and importing distributors' licenses." Id.

[2] The City's Council passed a resolution denying its approval for the double transfer; however, such approval is not required for the transfer of a distributor license. (R.R. at 10.)

[3] The City and Mr. Fairchild both filed timely protests and petitions to intervene, and Mr. Marraccini filed a petition to intervene. (R.R. at 12.) Additionally, a local resident with a home within 500 feet of the proposed location also filed a protest, but she did not appear at the hearing. (FOF ¶ 2.)

3

introduced. (FOF ¶¶ 27-28.) The proposed location is within the City's downtown area, there is no off-street parking at the proposed location, but there is a public parking lot next to the proposed location that can accommodate 24 vehicles. (Id. ¶¶ 23, 35.) The neighborhood within 500 feet of the proposed location is half residential and half commercial. (Id. ¶ 21.) The proposed location is within 200 feet of 8 other Board-licensed establishments and within 300 feet of Cornerstone Church and the Lenape Nation Cultural Center, which are restrictive institutions. (Id. ¶¶ 15-16.)

Mayor Panto testified that Applicant had been cited for approximately 30 violations of the City's Public Safety Code (Safety Code) over the years that, predominantly, were related to the apartment, and that there were ongoing illegal parking issues associated with Applicant's current business. (Id. ¶ 23.) However, Mayor Panto did not present any documentation related to those violations at the hearing. Mr. Desai presented a July 13, 2012, letter from the City's Assistant Code Administrator showing that, as of the date of the letter, Applicant had no outstanding Safety Code violations. (Id. ¶ 29.) Mayor Panto also indicated that the proposed transfer would impact the traffic in the City's downtown area. Mayor Panto did not think that Applicant was "a good community business" and, therefore, should not be rewarded with the License. (Id. ¶ 24.) Mayor Panto explained that the City wanted to locate distributorships in areas of the City that have off-street parking. (Id. ¶ 26.)

Mr. Marraccini and Mr. Fairchild, who own and/or operate businesses on the same block as the proposed location, expressed concern regarding the parking habits of Applicant's current customers, which includes a history of illegal double parking and blocking access to private off-street parking. (Id. ¶¶ 32, 39.) Mr.

4

Fairchild did not believe that Applicant was being proactive about keeping its current store safe and clean and questioned whether Applicant's customers would use carts to transport their beer purchases, and who would be responsible for those carts after their use. (Id. ¶ 34.) Like Mr. Fairchild and Mayor Panto, respectively, Mr. Marraccini believed that Applicant was not proactive in the operation of its business and that Applicant was not a "good steward" and should not be granted the privilege of selling alcohol. (Id. ¶¶ 37-38.)

Mr. Desai testified that Applicant opened the store in 1993, which is open from 7:00 a.m. to 8:00 p.m. Monday through Saturday and 7:00 a.m. to 5:00 p.m. on Sundays. (Id. ¶¶ 41-42.) Mr. and Mrs. Desai are the store's only employees, although a family friend does help out, and that friend may be hired as an employee if the License is granted and Applicant's business improves. (Id. ¶ 44-46.) Mr. Desai explained that, due to the economy, the grocery business is not doing well, and he hopes that discontinuing the grocery store and opening the distributorship will improve business. (Id. ¶ 47.) Mr. Desai pointed out that currently there are no Safety Code violations for the proposed location, he complies with the prohibition of selling tobacco products to minors, and he has not received any complaints as to how he is running the current business. (Id. ¶¶ 48, 58.) He explained that, while downtown businesses do not have their own parking, he believes that there is plenty of parking and that, while he has observed people double park, those people go to his store and to other establishments on the block. (Id. ¶ 56.) Mr. Desai stated that he could not control how people park and that, when he has asked people to move their vehicles, arguments occur. (Id. ¶ 59.)

After reviewing the record, the Board granted standing to the City (through Mayor Panto), Mr. Marraccini, and Mr. Fairchild, finding that each presented

5

sufficient evidence to show how they could be directly aggrieved by the grant of the application for double transfer. (Board Decision at 29.) The Board then addressed the Bureau's objections related to the proposed location's disqualifying proximity to other licensed establishments and restrictive institutions. (Board Decision at 20-24.) The Board noted that, although these disqualifying factors were undisputed and it *could* refuse to grant the double transfer application on these bases alone, it "probably would not have refused Applicant's [A]pplication based on [these] objection[s] alone," but that these objections "in conjunction with [the Bureau's] other objections provide more than enough evidence for the Board to refuse Applicant's [A]pplication."[4] (Board Decision at 22, 24.) The Board then examined whether it was required to refuse the Application because the double transfer would "adversely affect the health, welfare, peace, and morals of the neighborhood within a radius of five hundred (500) feet of the proposed" location. (Board Decision, Conclusion of Law (COL) ¶ 7.) Noting that a licensed establishment is not presumed to be detrimental to a community's welfare and that a perceived threat is insufficient to deny an application, the Board found that approving the double transfer "would harm the nearby residential community" because the testimony "provide[d] credible concerns regarding Applicant's impact to many of its surrounding neighbors." (Board Decision at 30-31 (citing Arrington v. Pa. Liquor Control Bd., 667 A.2d 439 (Pa. Cmwlth. 1995); K & K Enterprises, Inc. v. Pa. Liquor Control Bd., 602 A.2d 476 (Pa. Cmwlth. 1992)).) Citing the testimony regarding traffic and parking concerns, as well as the concerns that Applicant operates the current store to the detriment of the community, the Board

_____

[4] The Bureau's objection related to the missing tax clearance was rendered moot because the Bureau received the clearance. (Board Decision at 24.)

6

concluded that harm to the residents would occur and denied the Application. (Board Decision at 31-32; COL ¶¶ 7-8.)

### c.   Proceedings before Common Pleas

Applicant appealed, and common pleas held a non-jury trial during which the parties stipulated to certain facts based on the original hearing.[5]  Common pleas reviewed the Board's Decision, but noted that, pursuant to Section 464 of the Code, it was to "'hear the application de novo on questions of fact, administrative discretion and such other matters as are involved,'" and make its own findings of fact and reach its own conclusions based on those findings, Pennsylvania State Police v. Cantina Gloria's Lounge, Inc., 639 A.2d 14, 16 (Pa. 1994).  (Op. at 4 (quoting 47 P.S. § 4-464).)  Common pleas further observed, however, that it could not substitute its discretion for the Board's and could only reverse the Board's decision if there was a clear abuse of discretion.  Darlene Bar, Inc. v. Pa. Liquor Control Bd., 414 A.2d 721, 722 (Pa. Cmwlth. 1980).[6]

Citing Section 431(b) of the Code, which provides that a proposed licensed location's proximity to restrictive institutions and other licensed establishments are bases for refusing to grant a transfer of an existing license to a new location,

---

[5] The stipulated facts are based on the evidence presented at the hearing.  Common pleas also held a de novo hearing at which Mayor Panto and Mrs. Desai testified.  The hearing transcript from the de novo hearing is not included in the reproduced record.

[6] The de novo standard of review under Section 464 of the Code is broader than that stated in Darlene Bar, Inc.  Pursuant to this standard, common pleas, based on the de novo record, "may sustain, alter, modify or amend the Board's action even if it does not find materially different facts."  U.S.A. Deli, Inc. v. Pa. Liquor Control Bd., 909 A.2d 24, 27 (Pa. Cmwlth. 2006) (citing Pa. Liquor Control Bd. v. Richard E. Craft Am. Legion Home Corp., 718 A.2d 276, 278 (Pa. 1998)).  Applying this broader standard, we have held that if the Board has discretion to take an action, common pleas can exercise the same discretion under Section 464 of the Code.  U.S.A. Deli, Inc., 909 A.2d at 28.

common pleas concluded that "the existence of multiple other licensed establishments serves as sufficient basis for the Board's denial of a license transfer." (Op. at 4-5 (citing 47 P.S. § 4-431(b); Global Beer Distrib., Ltd. v. Pa. Liquor Control Bd., 800 A.2d 387 (Pa. Cmwlth. 2002); Chadds Ford Tavern, Inc. v. Pa. Liquor Control Bd., 736 A.2d 70 (Pa. Cmwlth. 1999)).) Common pleas also reviewed the testimony regarding the impact the proposed license transfer would have on their businesses and/or the neighborhood. Citing Section 17.12 of the Board's regulations, 40 Pa. Code § 17.12, and Burns v. Rebels, Inc., 779 A.2d 1245, 1250 (Pa. Cmwlth. 2001), common pleas found that the City (through Mayor Panto), Mr. Fairchild, and Mr. Marraccini had standing as intervenors because there was "a direct connection between the Board's decision [on] . . . [Applicant's] transfer and the impact of [Applicant's] operations on the [intervenors]." (Op. at 6-7.) Common pleas concluded that the testimony regarding the current traffic and parking concerns generated by Applicant's current customers and the anticipated increase due to the transfer of the License, along with Applicant's inability to provide designated off-street parking for its business, supported the denial of the Application because there was already double parking creating hazardous traffic conditions. (Id. at 7.) Common pleas concluded that

> A potential distributor, solely generating sales through selling heavy cases of beer, would require nearby parking readily available to its customers on a consistent basis. Without the existence of an off-street parking lot, the draw of a beer distributor[ship] would lead to even more congestion and traffic on an already busy street and likely interfere with the [C]ity's traffic flow.

(Id.) Additionally, common pleas cited testimony raising the City's concerns about "the proliferation of alcohol centered businesses in the downtown area" and there being eight licensed establishments in the area already. (Id. at 8.) Common pleas

8

concluded that, taking these concerns into consideration, the Board acted within its authority to deny the Application. For these reasons, common pleas affirmed the Board's Decision. Applicant now appeals to this Court.[7]

## II.     Arguments on Appeal
   *a.     Whether common pleas abused its discretion in finding that the City, Mr. Marraccini, and Mr. Fairchild have standing as intervenors.*

Applicant argues that common pleas erred in finding that the City, Mr. Marraccini, and Mr. Fairchild had standing to intervene because they only expressed general concerns regarding the welfare of the community, rather than a discernible adverse effect to their own interests. Applicant asserts that the City's objections were general, and Mayor Panto presented no expert testimony regarding parking or how the transfer would affect the community. Moreover, Applicant contends that neither Mr. Marraccini nor Mr. Fairchild presented evidence as to how they would be directly aggrieved by the transfer of the License. The Board responds that Mr. Fairchild, Mr. Marraccini, and the City, through Mayor Panto's testimony, presented sufficient evidence to demonstrate their direct interest in the double transfer application and that these interests would be aggrieved by the grant of the application. Thus, according to the Board, they had standing to intervene under Section 17.12(a) of the Board's regulations, 40 Pa. Code § 17.12(a).

"Granting or denying a petition to intervene is within the sound discretion of the agency involved," and that decision "will not be disturbed unless there has

---

[7] Applicant initially appealed to the Superior Court, which transferred the matter to this Court. This Court's "review is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence and whether the trial court committed an error of law or abused its discretion." Global Beer Distrib., 800 A.2d at 389 n.1.

9

been a manifest abuse of discretion." Malt Beverages Distrib. Ass'n v. Pa. Liquor Control Bd., 965 A.2d 1254, 1261 (Pa. Cmwlth. 2009). The Board's regulations set forth two different ways for individuals or entities to participate in the consideration of liquor license applications. Section 17.11 of the Board's regulations establishes who may file a protest to an application, providing, in relevant part:

(a) *When location is at issue.* When an application has been filed for a new retail liquor license, retail malt or brewed beverage license, importing distributor or distributor license, or the transfer of these licenses to a premises not then licensed, or for the extension of premises of these licenses, a protest may be filed with the Board by the following:

(1) A licensee whose licensed premises is located within 200 feet of the premises proposed to be licensed.

(2) A church, hospital, charitable institution, school or public playground located within 300 feet of the premises proposed to be licensed.

(3) A resident of the neighborhood within a radius of 500 feet of the premises proposed to be licensed.

(b) *When qualifications of an applicant are at issue.* A protest may be filed with the Board by a person having information regarding the qualifications of an applicant for a new retail liquor license, retail malt or brewed beverage license, importing distributor or distributor license, or for the transfer of these licenses to another person or when a corporation or club, as required by Chapter 5 Subchapter G (relating to change of officers of corporations and clubs) submits a change of officers, directors or stockholders.
. . . .

(e) *Need to intervene.* Only valid protests brought under subsection (a), relating to when location is at issue, render the protestant a party to the proceeding. A separate petition to intervene is not required for this purpose. Other protestants, including those objecting to the qualifications of an appellant, shall file a petition

10

to intervene under §§ 17.12 and 17.13 (relating to intervention in license application matters; and protests/intervention procedure), in order to become a party.

40 Pa. Code § 17.11(a), (b), (e). Section 17.12 of the regulations separately describes who may intervene in application matters stating:

(a) *A person*[8] *who can demonstrate a direct interest in an application* for a new retail liquor license, retail malt or brewed beverage license, importing distributor or distributor license, or the transfer of these licenses, whether person-to-person, place-to-place, or both, or an extension of premises of these licenses, *and who can further demonstrate that a Board decision contrary to the person's direct interest will cause the person to be aggrieved may file a petition to intervene*.

(b) The petition to intervene may be granted at the discretion of the Board. The Board may grant or deny the petition in whole or in part or may authorize limited participation. In rendering its decision, the Board will consider whether the petitioner has a direct interest in the proceeding and will be aggrieved by a Board decision contrary to that direct interest.

40 Pa. Code § 17.12 (emphasis added). Thus, there are those who can automatically file a protest and intervene in an application matter under Section 17.11(a) of the regulations based on their proximity to the proposed licensed location and status as resident, other licensed establishment, or restrictive institution. 40 Pa. Code § 17.11(a). Furthermore, Section 17.11(b) of the regulations allows a protest to be filed by those who have information regarding the qualifications of the applicant, but those individuals must satisfy the criteria set

---

[8] The Code does not define "person" but that term is defined by Section 1991 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1991, as "[i]nclud[ing] a corporation, partnership, limited liability company, business trust, other association, government entity (other than the Commonwealth), estate, trust, foundation or natural person."

11

forth in Section 17.12 of the regulations to the proposed intervenors. 40 Pa. Code § 17.11(b). Those who seek to intervene who do not fall within the Section 17.11(a) criteria must separately establish that they have a direct interest in the application and that they would be aggrieved by a Board decision contrary to that interest based on Section 17.12 of the regulations. 40 Pa. Code §§ 17.11(e), 17.12(a).

> To satisfy the aggrievement requirement of Section 17.12 of the regulations,

> a party seeking to intervene must demonstrate that it is aggrieved; in other words, it must have a direct and substantial interest in the adjudication and must show a sufficiently close causal relation between the decision and its asserted injury to qualify its interest as immediate. . . . To establish an 'aggrieved' status, a party must have a substantial interest, that is, there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. Also, an interest must be direct, which 'means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains.' Further, the interest must be immediate and not a remote consequence of the judgment, a requirement addressing the nature of the causal connection.

Malt Beverages Distrib. Ass'n, 965 A.2d at 1261-62 (citations and quotations omitted).

The City, Mr. Fairchild, and Mr. Marraccini do not qualify for standing under Section 17.11(a) of the regulations as they do not fall into any of the enumerated categories therein. Therefore, they had to file petitions to intervene under Section 17.12 of the regulations. In order to be granted intervenor status, each had to prove that he has "a direct interest in [the] application" and "that a Board decision contrary to the person's direct interest will cause the person to be aggrieved." 40 Pa. Code § 17.12(a). A review of the testimony of Mr. Fairchild and Mr. Marraccini reveals that each testified regarding the impact the current

12

parking issues have on his individual business, located within the same block as the proposed location, and his concern that the increase in business associated with the approval of the Application could exacerbate those problems. (Hr'g Tr., Apr. 5, 2013, at 41-44, 53, R.R. at 80-83, 92.) The discernable interests asserted by Mr. Fairchild and Mr. Marraccini are greater "than the abstract interest of all citizens in having others comply with the law," the alleged harm from the potential exacerbation of the current parking problems associated with the proposed location could be caused by the grant of the double transfer, and would not be a remote consequence of granting the double transfer. Malt Beverages Distrib. Ass'n, 965 A.2d at 1261. Thus, there is no abuse of discretion in finding that Mr. Fairchild and Mr. Marraccini qualify as intervenors under Section 17.12(a) of the regulations.

The City's status as intervenor is a closer question. The City's interest initially appears to be more akin to the "abstract interest of all citizens in having others comply with the law." Malt Beverages Distrib. Ass'n, 965 A.2d at 1261. Although Mayor Panto testified regarding the parking issues, traffic issues, the City's desire not to have a proliferation of alcohol-based businesses downtown, and his concern about having a distributorship in an area with no dedicated off-street parking, it is questionable whether such general concerns demonstrate the required "substantial interest" to grant the City status as an intervenor. However, City Council passed a resolution reflecting its disapproval of this Application, and the meeting minutes reflect that Applicant had received multiple Safety Code violations and that the City's Code Department disagreed with the grant of this Application. Although there were multiple hearsay objections to Mayor Panto's testimony and the introduction of the minutes of the City Council meeting at the

13

administrative hearing, when Mayor Panto testified to this material before common pleas, there were no hearsay objections. (Hr'g Tr., Jan. 12, 2015, at 12-15.) Similarly, the City Council meeting minutes, which showed the nature and number of the code violations by Applicant's present business/apartment, as well as the opinion of the City's Code Department, were introduced into the record at the de novo hearing before common pleas with no objection. (Id. at 10-11.) Unlike in an administrative hearing, which is governed by the rule set forth in Walker v. Unemployment Compensation Board of Review, 367 A.2d 366 (Pa. Cmwlth. 1976),[9] unobjected to hearsay evidence provided before common pleas "is accorded the same weight as evidence legally admissible as long as it is relevant and material to the issues in question," B.D.B., Inc. v. Pennsylvania Liquor Control Board, 445 A.2d 1360, 1361 (Pa. Cmwlth. 1982) (internal quotation omitted). Given the City's particular interest in this Application and the potential impact the grant of which could have on the neighborhood, as well as the concerns of the City's Code Department, we agree with common pleas that the Board did not abuse its discretion to grant the City intervenor status.

> b. *Whether common pleas erred in finding that the double transfer would be a detriment to the health, welfare, peace, and morals to the residents within a radius of 500 feet of the proposed location.*

Applicant next argues that there is insufficient evidence to support the finding that the double transfer would be a detriment to the health, welfare, peace,

---

[9] Under the Walker rule, hearsay evidence that is objected to is not competent to support a finding of fact, but such "evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding . . ., [i]f it is corroborated by any competent evidence in the record, but a finding of fact based [s]olely on hearsay will not stand." Walker, 367 A.2d at 370.

14

and morals of the residents within a radius of 500 feet of the proposed location. Applicant asserts that, even accepting the City, Mr. Marraccini, and Mr. Fairchild as intervenors, there was no evidence that the proposed location would be detrimental to the welfare, health, peace, and morals of the inhabitants of the residences within a radius of 500 feet as required by Section 431(b) of the Code. Applicant asserts that no individual resident who resides within 500 feet of the proposed location filed a protest, and Mr. Fairchild and Mr. Marraccini represented businesses, i.e., organizations, and are not themselves residents. According to Applicant, businesses or organizations cannot present evidence on detriment pursuant to Irem Temple AAONMS v. Pennsylvania Liquor Control Board, 87 A.3d 983, 993 (Pa. Cmwlth. 2014), and absent that testimony, there is little evidence to support the denial of the double transfer. The Board counters that the testimony of Mayor Panto, Mr. Fairchild, and Mr. Marraccini constitutes substantial evidence that supports common pleas' finding that granting the transfer would be detrimental to the health, welfare, peace, and morals of the neighborhood surrounding the proposed location.

Section 431(b) of the Code provides, in relevant part, that:

> [I]n the case of any new license or the transfer of any license to a new location, the board may, in its discretion, grant or refuse such new license or transfer if such place proposed to be licensed is within three hundred feet of any church, hospital, charitable institution, school or public playground, or if such new license or transfer is applied for a place which is within two hundred feet of any other premises which is licensed by the board: And provided further, That the board *shall refuse* any application for a new license or the transfer of any license to a new location *if, in the board's opinion, such new license or transfer would be detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood within a radius of five hundred feet of the place proposed to be licensed.*

47 P.S. § 4-431(b) (emphasis added). In In re 23rd St., Inc., 517 A.2d 581, 582 (Pa. Cmwlth. 1986) (Logan Square Neighborhood Association), we stated:

> The legislature has established the principle that a licensed establishment is not ordinarily detrimental to the welfare, health and morals of the inhabitants of the neighborhood. Parks v. P[a.] Liquor Control B[d.], . . . 403 A.2d 628[, ] ([Pa. Cmwlth.] 1979). A transfer [of a liquor license] will be detrimental only in cases where the nature of the establishment to be licensed is such that it will adversely affect the nature and character of its neighborhood.

Applicant argues that common pleas erred in finding that the double transfer would be "detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood within a radius of [500] feet," 47 P.S. § 4-431(b), of its proposed location because it relied on the testimony of the intervenors who, representing the City and local businesses, could not be "inhabitants" under this Court's decision in Irem Temple. While this Court did, in Irem Temple, define the term "inhabitant" as including individual residents and excluding organizations, such as the fraternal organization in that case, Irem Temple involved whether that organization had *standing* as an *inhabitant to appeal* to the court of common pleas under Section 464 of the Code.[10] Irem Temple, 87 A.3d at 993-94. That is not the issue here.

---

[10] Section 464 provides the right to appeal to common pleas to

> Any applicant who has appeared at any hearing, as above provided, who is aggrieved by the refusal of the board to issue any such license or to renew or transfer any such license or to issue or renew any amusement permit may appeal, or any church, hospital, charitable institution, school or public playground located within three hundred feet of the premises applied for, aggrieved by the action of the board in granting the issuance of any such license or the transfer of any such license, may take an appeal limited to the question of such grievance, within twenty days from date of refusal or grant, to the court of common pleas of the county in which the premises or permit applied for is located.

**(Footnote continued on next page…)**

16

Rather, the question Applicant raises is whether non-residential inhabitants, such as a business owner whose business is located within close proximity of the proposed location and who claims to be potentially aggrieved if the application is granted, may present evidence and testify regarding whether the "transfer would be detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood within a radius of [500] feet" of a proposed distributorship. 47 P.S. § 4-431(b). We conclude that they may do so. As discussed above, such persons, which includes corporations, partnerships or other associations, may intervene if they establish a direct interest that could be aggrieved by the grant of the application. 40 Pa. Code § 17.12(a); Section 1991 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1991. Although the Board may, in its discretion, limit the participation of an intervenor, 40 Pa. Code § 17.12(b), the Board here permitted the intervenors to present evidence regarding the alleged detriment to their own businesses and the City and to the neighborhood of which they are a part. We discern no abuse of discretion or error in doing so.[11]

_____

**(continued…)**
47 P.S. § 4-464. In Fisher v. Pennsylvania Liquor Control Board, 500 A.2d 218, 219 (Pa. Cmwlth. 1985), this Court held that an inhabitant who protested the application and resided within 500 feet of the proposed establishment was entitled to appeal the Board's grant of a liquor license to common pleas. This Court, in Irem Temple, held that, even though the fraternal organization did not have standing to appeal to common pleas, it could appeal the Board's order directly to this Court under Section 702 of the Administrative Agency Law, 2 Pa. C.S. § 702. Irem Temple, 87 A.3d at 994; see also Burns, 779 A.2d at 1249 (stating that even if an intervenor does not have standing to appeal to common pleas under Section 464 of the Code, an aggrieved intervenor can appeal directly to this Court under Section 702 of the Administrative Agency Law).

[11] Moreover, to the extent Applicant's argument also could be interpreted as meaning that, because the term "inhabitant" means only individual residents, the welfare, health, peace and morals of neighborhoods zoned commercial or "commercial residents" located within neighborhoods with mixed zoning need not be considered, such a reading would conflict with Pennsylvania Liquor Control Board v. Bilinsky, 298 A.2d 698, 699-700 (Pa. Cmwlth. 1972). In **(Footnote continued on next page…)**

Having concluded that non-residential "inhabitants" can provide evidence regarding potential detriment to the neighborhood, we now consider whether the record here contains substantial evidence to support the finding that granting the Application would cause such detriment. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In re License Renewal Application of the Quippan Club License #C-4110 LID #1889, 806 A.2d 491, 495 n.5 (Pa. Cmwlth. 2002). After a thorough review of the record, we conclude that it does not contain substantial evidence to support common pleas' finding of detriment based on insufficient parking and traffic concerns.

When this Court previously has considered insufficient parking/parking problems, increased traffic hazards, and the exacerbation of such problems as adversely affecting the welfare, health, peace and morals of a neighborhood, we have done so only where those problems are established by *non-general, non-speculative evidence*. Manayunk Dev. Corp. v. Pa. Liquor Control Bd., 715 A.2d 518, 521-22 (Pa. Cmwlth. 1998). For example, in Manayunk, the protestors presented the testimony of the city council person for the area regarding the extensive efforts made to control parking in the area, a civil engineer whose firm performed traffic and parking studies in the area and who explained that the lack of convenient parking caused traffic congestion, the testimony of a local resident who

_____

(continued…)

Bilinsky, we held that the Board did not abuse its discretion in denying an application for a restaurant liquor license under Section 404 of the Code, 47 P.S. § 4-404 (governing restaurant liquor licenses and containing the same language regarding adverse impacts on the inhabitants of the neighborhood within 500 feet of the proposed premises), because it would adversely affect the welfare, health, peace and morals of the neighborhood within 500 feet of the premises, even though the neighborhood was *commercial* in nature.

18

frequently was unable to park her vehicle within a two-block radius of her home, and an urban planner who reviewed the difference between the demand for parking and the availability of parking and opined that *any increase in seating capacity at a licensed restaurant* would increase the demand and exacerbate the existing deficit in parking. Id. However, no such specific evidence regarding parking and traffic was offered here. There were no studies about the demand for parking versus the availability of parking and, in fact, Mr. Fairchild agreed that the public parking lot located adjacent to the proposed location frequently had *available parking spots*. (Hr'g Tr., Apr. 5, 2013, at 50, R.R. at 89.) Nor were there any traffic studies which showed how the transfer of the License to Applicant would impact traffic. Instead, common pleas relied upon general testimony that parking and traffic were already a problem and granting the license, and increasing Applicant's business, would exacerbate that problem. (Op. at 7.)

The evidence offered here is more akin to that presented in Logan Square Neighborhood Association, 517 A.2d at 582, and Arrington, 667 A.2d at 445, which was found to be insufficient to support the denial of a license application. In Logan Square Neighborhood Association, the protestor presented the testimony of "witnesses who objected to[, *inter alia*,] the possible parking problems, . . . traffic[,] and the perceived threat that the service and consumption of liquor could harm the quiet, residential character of the neighborhood." Logan Square Neighborhood Ass'n, 517 A.2d at 582. Noting that the area was zoned commercial and that the primary objections were related to increased traffic and alcohol consumption in the neighborhood, we affirmed the common pleas court's order reversing the denial of the application because "there is no legal correlation between the availability of alcoholic beverages and dangerous driving per se, . . .

19

and the evidence in the record is insufficient to show any such correlation." Id. Finally, in Arrington, the Board found a detriment to a neighborhood and denied a transfer of a restaurant license based on the testimony of the protestors that there were "terrible" parking and traffic problems in their neighborhood that had improved during the period the restaurant at issue had been closed and that to allow the transfer of a restaurant license to that location would recreate those same problems. Arrington, 667 A.2d at 444-45. We reversed, based on K & K Enterprises and Logan Square Neighborhood Association, because there was no evidence of a correlation between alcohol consumption and the reasons for the objection to the transfer. Arrington, 667 A.2d at 445.

Here, common pleas upheld the denial of the Application because of the asserted existing parking issues, the lack of off-street parking available to Applicant's customers, and concerns regarding increased traffic. (Op. at 7-8.) Common pleas stated that "[a] potential distributor, solely generating sales through selling heavy cases of beer, would require nearby parking readily available to its customers on a consistent basis." (Op. at 7.) However, it is undisputed that, in addition to on-street parking, there is a public, off-street parking lot located *immediately adjacent* to the proposed location with at least 24 spaces, and Mr. Fairchild agreed that one could typically find parking there. (Hr'g Tr., Apr. 5, 2013, at 47-50, R.R. at 86-89; Hr'g Tr., Jan. 12, 2015, at 16.) Notably, Mayor Panto acknowledged at the de novo hearing that, under the City's Zoning Code, Applicant "*did not require additional parking* because they [are] in [the] Downtown Business District" even though they would be putting a beer distributorship at the proposed location. (Hr'g Tr., Jan. 12, 2015, at 17 (emphasis added).) Moreover, much of the testimony was based on the parking habits of

20

Applicant's *current* customers, who were double parking or parking illegally to purchase cigarettes, and even common pleas acknowledged that Applicant's *future* customers could be a different type of clientele. (Hr'g Tr., Apr. 5, 2013, at 31, R.R. at 70; Hr'g Tr., Jan. 12, 2015, at 13, 22-23, 26.)

Furthermore, the objections and testimony regarding the traffic and parking concerns relate to the *possible increase* that Applicant's business would experience if the License was granted. However, *any increase* in Applicant's business, whether related to obtaining the License or some other new business venture, would arguably exacerbate traffic and parking problems. Thus, the evidence presented does not establish that the detriment that would be caused is related to the proposed location *becoming a licensed establishment*, but is more generally related to Applicant's attempts to become a more successful business. In other words, "there is no legal correlation between the availability of alcoholic beverages" and increased traffic and parking problems, and there was no evidence introduced that would establish that correlation. Logan Square Neighborhood Ass'n, 517 A.2d at 582. This is unlike the specific testimony presented in Manayunk, in which the urban planner testified "that any additional seating capacity for restaurants *with liquor licenses* [would] increase the demand for parking spaces . . . and enlarge the deficit of parking spaces that already exists." Manayunk, 715 A.2d at 522 (emphasis added). The *general* concern raised here that *any* increase in Applicant's business would be a detriment to the neighborhood is insufficient to deny the Application under Section 413 of the Code. Arrington, 667 A.2d at 446-47; K & K Enterprises, 602 A.2d at 480; Logan Square Neighborhood Ass'n, 517 A.2d at 582.

21

Alternatively, the Board asserts common pleas properly affirmed the Application's denial under Section 431(b) of the Code because it is undisputed that the proposed location is within 200 feet of 8 other licensed entities and 300 feet of 2 restrictive institutions. These reasons, the Board argues, are independent bases for denying the Application. 47 P.S. § 4-431(b); Global Beer Distrib., 800 A.2d at 390; Chadds Ford Tavern, 746 A.2d at 73. Applicant argues that this is insufficient to deny the Application because none of those licensed establishments or restrictive institutions protested the application.

As we stated in Global Beer Distributing, "[t]he 200-foot rule is to be administered by the Board and not the neighbors of the proposed facility." Global Beer Distrib., 800 A.2d at 390. "[I]t is firmly established that the absence of protests is not controlling." Home Aid Ass'n of John C. Tressler Post No. 3504 v. Com., Liquor Control Bd., 360 A.2d 834, 835 (Pa. Cmwlth. 1976); see also In re Her-Bell, Inc., 107 A.2d 572, 574 (Pa. Super. 1954) (stating "the Board may in its discretion refuse such transfer" and that "[t]he exercise of the Board's discretion is not contingent upon the existence of a protest by the restrictive institution"). Thus, the fact that there were no protests is of no moment.

Here, common pleas held that the proposed location's being within 200 feet of 8 other licensed establishments was sufficient reason for the Board's denial of the Application even without the other protests. (Op. at 5-6.) However, the Board did not deny the Application on these grounds. Rather, the Board stated that it "*probably* would not have" denied the Application solely because of the 200-foot rule or solely because of the 300-foot rule; it concluded, in its discretion, that each rule, *when combined with the Bureau's other objections*, was "more than enough

22

evidence for [it] to refuse Applicant's [A]pplication." (Board Decision at 22-24 (emphasis added).) Thus, the Board did not exercise its discretion to deny the Application on those bases, as authorized by Section 431(b) of the Code, such that they could be *independent* reasons to affirm common pleas' Order affirming that denial.

## III. Conclusion

Because we conclude that common pleas' finding that the proposed double transfer of the License would be "detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood within a radius of [500] feet," 47 P.S. § 4-431(b), of the proposed location is not supported by substantial evidence and reject the alternative reason offered to affirm common pleas' Order, we reverse that Order affirming the Board's denial of Applicant's Application.

_____
**RENÉE COHN JUBELIRER,** Judge

23

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Application of VRAJ, Inc.      :
T/A Jack's Market      :
     :
              v.      :   No. 2592 C.D. 2015
     :
Pennsylvania Liquor Control Board      :
     :
Appeal of: VRAJ, Inc.      :

## O R D E R

NOW, November 30, 2016, the Order of the Court of Common Pleas of Northampton County, entered in the above-captioned matter, is reversed.

_____

**RENÉE COHN JUBELIRER,** Judge